Adam Keats (CA Bar No. 191157) (*pro hac vice*)
John Buse (CA Bar No. 163156) (*pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
351 California Street, Suite 600
San Francisco, CA 94104
Telephone: (415) 436-9682 x 304
Facsimile: (415) 436-9683
akeats@biologicaldiversity.org
jbuse@biologicaldiversity.org

Attorneys for Plaintiff Center for Biological Diversity

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

## PRESCOTT DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY<br><br>              Plaintiff,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT; RON WENKER, Acting Director of U.S. Bureau of Land Management; JAMES KENNA, BLM Arizona State Director; KEN SALAZAR, Secretary of Interior, and U.S. FISH AND WILDLIFE SERVICE,<br><br>              Defendants,<br><br>NATIONAL RIFLE ASSOCIATION,<br><br>              Defendant-Intervenor, | Case No. CV 09-8011-PCT-PGR<br><br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.    INTRODUCTION

1.    This is an action for declaratory and injunctive relief challenging the continuing failure of the U.S. Bureau of Land Management and the U.S. Fish and Wildlife Service to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq.,* the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, and the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 *et seq.*, in managing the public lands and endangered and threatened species of the Arizona Desert.  Defendants have failed to comply with NEPA, FLPMA, and ESA by refusing to incorporate actions necessary to protect public lands and endangered and threatened species from adverse impacts of excessive off-road vehicle ("ORV") use and livestock grazing in their land and wildlife management planning for the federal lands administered by the Arizona Strip Field Office ("ASFO"), the federal lands of the Vermilion Cliffs National Monument ("VCNM"), and federal lands of the Grand Canyon-Parashant National Monument ("GCPNM") (together, "Arizona Strip").

2.    Specifically, Plaintiff challenges the Bureau of Land Management's adoption of the Proposed Resource Management Plans and the Final Environmental Impact Statement ("FEIS") for ASFO, VCNM, and GCPNM because, among other things, the proposed plans permit the use of motorized and mechanized vehicles off road; legitimize and adopt vehicle routes that were illegally created; fail to provide adequate environmental review; and fail to provide the public with the information required by NEPA.

3.     Plaintiffs also challenge the failure of both the Bureau of Land Management and the Fish & Wildlife Service to insure listed species' survival, to avoid jeopardizing the continued existence of listed species, and to avoid adverse modification and significant impacts to designated critical habitat.  The Bureau of Land Management's approval of and implementation of the land management plans for the Arizona Strip and Fish and Wildlife's approval of these actions through the issuance of a Biological Opinion violate the procedural and substantive mandates of the ESA.  The current action arises under and alleges violations under the ESA, 16 U.S.C. § 1531 *et seq*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 *et seq*.

4.     The Bureau of Land Management also violated FLPMA, Presidential Executive Orders, other federal laws, and its own regulations, which require that the Bureau minimize the effects of motorized vehicle use, including ORV use, on public land resources.  Furthermore, the process used to assess routes in the proposed plans ignored foreseeable impacts of routes and did not prioritize protection of Monument objects or limit motorized and mechanized vehicles to roads in the Monuments, and is thus inconsistent with the Monument Proclamations.

5.     The proposed plans fail to adequately protect riparian areas, forest habitats, and wildlife (including the California condor, desert tortoise, the relict leopard frog, desert bighorn sheep, and Welsh's milkweed) within GCPNM and VCNM from the impacts of livestock grazing in violation of the ESA, NEPA, FLPMA, and the Monument Proclamations.  Without having rigorously analyzed the impacts of livestock grazing on the natural and historic objects of VCNM and GCPNM, the proposed plans fail to satisfy the requirements of NEPA.

Second Amended Complaint for Declaratory and Injunctive Relief                    Page 3

6.    The proposed plans for VCNM and GCPNM improperly rely on "multiple-use" principles to determine and designate permissible activities within the Monuments.   FLPMA requires the Bureau of Land Management to manage public lands under multiple-use principles unless an area has been designated by law for specific uses, in which case the Bureau must manage the land for those specific uses. 43 U.S.C. § 1732(a). Accordingly, standard multiple-use principles do not apply to these Monuments, and such a management approach to the detriment of historic values is in violation of the Presidential Proclamations and the mandates of FLPMA. The Bureau must manage the Monuments for the protection and preservation of historic and scientific values, and only allow multiple-uses when those uses do not conflict with the directives of the Proclamations.

7.    Absent proper management by the Bureau of Land Management, including compliance with NEPA, FLPMA, ESA, and other laws, these fragile ecosystems and the species that depend on them are in grave danger of disappearing forever.   Plaintiffs seek an order from the Court overturning the agency's unlawful management decisions and requiring the Bureau of Land Management and the Fish and Wildlife Service to comply with NEPA, FLPMA, ESA, and other statutes, regulations, orders and plans, and to protect these species and their habitats.

## II.    JURISDICTION AND VENUE

8.    Jurisdiction over this action is conferred by 28 U.S.C. §§ 1331 (federal question), 1346, (United States as defendant), 2201 (declaratory judgment), 2202 (injunctive relief), 16 U.S.C. § 1540(g) (ESA), and 5 U.S.C. §§ 701 through 706 (APA).

9.    On December 10, 2008, Plaintiff, by facsimile and certified

mail, sent a notice of intent to sue to the Bureau of Land Management and the Fish and Wildlife Service for violations of the ESA related to the Bureau's management of the Arizona Strip pursuant to the Resource Management Plans for the Arizona Strip.  This notice was sent to the Arizona Strip Field Manager, the Monument Manager for VCNM, the Acting Monument Manager for GCPNM, the Secretary of Interior, the Director of the Fish and Wildlife Service, and the U.S. Attorney General. For all claims brought pursuant to the ESA and/or the APA Plaintiffs have exhausted all of the administrative remedies available to them.

10.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391(e) because the areas at issue are situated within the district of Arizona.

### III.   PARTIES

11.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a national, nonprofit organization with its main office in Tucson, Arizona.  The Center's mission is to protect endangered species and wild places through science, policy, education, and environmental law.  The Center has approximately 60,000 members, many of whom reside in Arizona.  The Center's members and staff regularly use, and will continue to use the Arizona Strip for observation, research, aesthetic enjoyment, and other recreational, scientific, and educational activities.  The Center's members and staff have and continue to research, study, observe, and seek protections for the desert tortoise, mountain lion, bighorn sheep, relict leopard frog, pronghorn antelope, and mule deer, listed endangered species and sensitive species of the Arizona Strip.  The Center's members and staff derive scientific, recreational, conservation, and aesthetic benefits from these species' existence in the wild.  Defendants' violations of law may cause

adverse impacts to tortoise, mountain lion, bighorn sheep, antelope, frog and deer populations and degradation of their habitat, as well as other adverse impacts to the resources of the Arizona Strip, harming the Center's and its members' interests in these areas.  Defendant's violations of law are leading the decline of listed and sensitive species within the Arizona Strip area and the degradation of habitat occupied by these species, harming the Center's and its members' interests in these species and their habitats.  The Center brings this action on behalf of itself and its adversely affected members and staff.

12.    Defendant UNITED STATES BUREAU OF LAND MANAGEMENT (referred herein, together with Defendants WENKER, KENNA, and SALAZAR, collectively as "BLM") is a federal agency within the Department of Interior charged with the management of public lands, including those within the Arizona Strip and those lands that it manages in the GCPNM and VCNM.  BLM has legal responsibility for ensuring that its actions comply with NEPA, FLPMA, and all other federal laws.

13.    Defendant RON WENKER (referred herein, collectively with Defendants BLM, KENNA, and SALAZAR, as "BLM") is sued in his official capacity as Acting Director of the U.S. Bureau of Land Management.   Mr. Wenker is responsible for ensuring that lands administered by BLM are managed in accordance with all applicable laws and regulations.

14.    Defendant JAMES KENNA (referred herein, collectively with Defendants BLM, WENKER, and SALAZAR, as "BLM") is sued in his official capacity as the Arizona State Director of BLM.  Mr. Kenna is responsible for ensuring that BLM lands in Arizona are managed in accordance with all applicable laws and regulations.

15.    Defendant KEN SALAZAR (referred herein, collectively with Defendants BLM, WENKER, and KENNA, as "BLM", and also referred herein, collectively with Defendant US FISH AND WILDLIFE SERVICE, as "FWS") is sued in his official capacity the Secretary of the United States Department of the Interior.   Among other things, Secretary Salazar is charged with overseeing the management of the nation's BLM lands and compliance with ESA, NEPA, FLPMA, and all other applicable laws and regulations.   Secretary Salazar is also the federal official in whom the ESA vests final responsibility for providing biological opinions and protecting species listed under the ESA.   The Secretary has delegated responsibility for the administration and implementation of the ESA to the United States Fish and Wildlife Service.

16.    Defendant UNITED STATES FISH AND WILDLIFE SERVICE (referred herein, collectively with Defendant SALAZAR, as "FWS") is an agency of the United States government, and is an agency within and under the jurisdiction of the Department of the Interior.   Through delegation of authority from the Secretary, FWS administers and implements the ESA, and is legally responsible for the protection and management of the fish, wildlife, and native plant resources of the United States, through enforcement and implementation of the ESA. FWS is also charged with determining through the consultation process whether federal agency actions that affect listed species or designated critical habitats comply with the ESA.

## IV.   LEGAL BACKGROUND

### A.    Federal Land Policy and Management Act

17.    The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701-1785, declares that the public lands be managed for multiple

uses in a manner that will protect the quality of the scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values.  43 U.S.C. § 1701 (a)(7) & (8).

18.    FLPMA contains several provisions related to BLM's planning and management of lands such as the Arizona Strip.  In carrying out any action in the Arizona Strip, BLM is required to act in accordance with FLPMA and its implementing regulations.  See 43 U.S.C. §§ 1731, 1740.

19.    FLPMA requires that BLM develop a "comprehensive, long-range plan for the management, use, development, and protection of the public lands within the [Arizona Strip]."  43 U.S.C. § 1781(d).

20.    FLPMA requires that BLM "minimize adverse impacts on the natural, environmental, scientific, cultural, and other resources and values (including fish and wildlife habitat) of the public lands involved."  43 U.S.C. §1732(d)(2)(a).

21.    FLPMA requires that BLM prepare and maintain a current inventory of all public lands and their resources.  43 U.S.C. §1711(a). Similarly, FLPMA provides that the systematic inventory of public lands and their resources form the basis of the land use planning process.  43 U.S.C. §1701(a)(2).  Accordingly, the regulations implementing FLPMA require that BLM collect resource and environmental inventory data and information and that such data and information "shall be collected in a manner that aids application in the planning process, including subsequent monitoring requirements." 43 C.F.R. §1610.4-3.

22.    To protect and conserve the Arizona Strip and its resources, FLPMA also requires that BLM "shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C § 1732(b).

**B.      The National Environmental Policy Act**

23.      The purpose of NEPA is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321.   NEPA effectuates this objective by requiring that federal agencies: (1) take a "hard look" at the environmental consequences of their actions before these actions occur by ensuring that the agency carefully considers detailed information concerning significant environmental impacts; and (2) make the relevant information available to the public so that it may also play a role in both the decision-making process and the implementation of that decision. See, e.g., 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1500.1.

24.      NEPA and the regulations promulgated thereunder by the Council on Environmental Quality ("CEQ") require that all federal agencies, including the BLM, must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); see also 40 C.F.R. § 1501.4.

25.      An EIS must provide a detailed statement of: (1) the environmental impact of the   proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.  42 U.S.C. § 4332(2)(C).

26.      NEPA is intended to ensure that agencies make informed choices when federal decisions are likely to have environmental consequences.  To that end, an EIS must "inform decision-makers and the

public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."   40 C.F.R. § 1502.1.   NEPA also requires federal agencies to accurately describe the affected environment (also called the baseline or environmental setting) and the consequences of the action, to analyze the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1502.15, 1502.16, 1508.7, 1508.8.   One of the most important aspects of NEPA is that the agency is required to consider the cumulative effects of its actions, which the CEQ regulations describe as:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.   Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.   In the context of route designations including ORV routes, NEPA requires that agencies such as the BLM consider and disclose to the public the cumulative impacts of the designations on biological resources, vegetation, water quality, cultural resources and other resources of the public lands.

27.    When preparing an EIS, an agency must ensure that high quality information is available to the agency and the public before any decision is made or action is taken.   Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA. 40 C.F.R. § 1500.1(b).   The agency is required to identify clearly all of its assumptions, to explain any inconsistencies, to disclose all methodologies used, to rebut all contradictory evidence, to eliminate guesswork, to make

explicit reference to sources relied upon for conclusions, and to record in an understandable manner the basis for those conclusions.   40 C.F.R. § 1502.24.

28.   NEPA requires federal agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. §4332(2)(E).  The analysis of alternatives is the "heart" of the environmental review process; the EIS must "rigorously explore and objectively evaluate all reasonable alternatives," in order to "provid[e] a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14(a).  Alternatives that must be considered include the following:  (1) a "no action" alternative, (2) other reasonable courses of actions, and (3) mitigation measures (not in the proposed alternative).   A "reasonable range" of alternatives must be considered, and this must include consideration of full protection of all the resources involved.  The exclusion of reasonable alternatives from review under an EIS renders the analysis invalid.

29.   In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action.   40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

## C.   Executive Orders and Regulations Regarding ORVs

30.   In 1972, President Nixon issued Executive Order 11644, entitled "Use of Off-Road Vehicles on the Public Lands." That Executive Order imposed a number of specific and non-discretionary duties on the Secretary to control and minimize the effects of ORV use.   These duties

include: classifying all BLM lands as either "open," "closed," or "limited" to ORV travel; designating trails for ORV use in limited areas; marking areas and trails and providing the public with maps depicting such classifications and designations; minimizing the effects of ORV use on specifically identified natural resources; and monitoring ORV impacts throughout BLM lands.

31.    In 1978, President Carter issued Executive Order 11989, which amended Executive Order 11644 (collectively "the Executive Orders"), and gave federal agencies additional direction and authority to control ORV use. Executive Order 11989 empowered federal agencies to adopt a "closed, unless signed open" policy, and also to immediately close areas suffering from ORV damage.  The Executive Orders were enacted in furtherance of NEPA, 42 U.S.C. §§ 4321 et seq., and are found in the note following 42 U.S.C. § 4321.

32.    In 1979, the BLM issued its off-road vehicle regulations, 43 C.F.R. §§ 8340-42.  These regulations further implement, and largely restate, the planning, informational, and monitoring requirements of the Executive Orders.  Specifically, the regulations require that the BLM locate ORV trails so as "to minimize damage to soil, watershed, vegetation, air, or other resources of the public lands and to prevent impairment of wilderness suitability," 43 C.F.R. § 8342.1(a), "to minimize harassment of wildlife or significant disruption of wildlife habitats," 43 C.F.R. § 8342.1(b), and prohibit trails in "officially designated wilderness areas or primitive areas," 43 C.F.R. § 8342.1(d).  The regulations also require BLM to close areas to ORVs where ORVs are causing or will cause negative impacts to soil, vegetation, wildlife, wildlife habitat, cultural resources, wilderness suitability, or threatened and endangered species.  43 C.F.R. § 8341.2(a).

An area closed to ORVs under this provision can only be reopened to such vehicles if BLM "determines that the adverse effects have been eliminated and measures implemented to prevent recurrence." *Id*.

**D.     Endangered Species Act**

33.     *Listing of Species.*  The ESA requires the Secretary of the Interior ("the Secretary") to issue regulations listing species as endangered or threatened based on the present or threatened destruction, modification, or curtailment of a species' habitat or range; over-utilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the species' continued existence.  16 U.S.C. § 1533(a)(1).   An endangered species is one "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(a).   A threatened species is one that will become endangered if current circumstances continue.  The ESA requires that the Secretary make listing determinations "solely on the basis of the best scientific and commercial data available."  16 U.S.C. § 1533(b)(1)(A).  Only if officially listed does a species receive the full protection of the ESA.  The ultimate goal of the law is to conserve and recover species so that they no longer require the protections of the ESA.  16 U.S.C. §§ 1531(b), 1532(3).  The Secretary has delegated his authority under the ESA to FWS for terrestrial species including the desert tortoise, California condor, and other listed species found in the Arizona Strip.

34.     *Critical Habitat.*  Concurrently with listing a species as threatened or endangered, the Secretary must also designate the species' "critical habitat."  16 U.S.C. § 1533(b)(2).  "Critical habitat" is the area that contains the physical or biological features essential to the

"conservation" of the species and which may require special protection or management considerations.  16 U.S.C. 1532(5)(A).  The ESA requires the Secretary to make critical habitat designations and amendments "on the basis of the best scientific data available."  16 U.S.C. § 1533(b)(2).  The ESA defines "conservation" to mean "…the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary."  16 U.S.C. §1532(3).  This definition of "conservation" is broader than mere survival; it also includes the recovery of species.  Id.

35.  *Recovery Plans.*  Section 4(f) of the ESA requires the Secretary to "develop and implement plans . . . for the conservation and survival of endangered species and threatened species."  16 U.S.C. §1533(f).  Recovery plans must include a description of site-specific management actions that may be necessary to achieve the conservation and survival of the species; objective, measurable criteria which, when met, would result in a determination that the species be removed from the list; and estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.  16 U.S.C. § 1533(f)(1).

36.  *Duty to Conserve.*  Federal agencies have an affirmative duty to promote the conservation (*i.e.*, recovery) of threatened and endangered species.  ESA Section 2(c) provides that it is "…the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."  16 U.S.C. §1531(c)(1).  Section 7(a)(1) also establishes an affirmative duty to conserve.  16 U.S.C.

§ 1536(a)(1).   The duty to conserve applies equally to the Secretary of Interior and other agencies.

37.   *Duty to insure survival and recovery; duty to consult.* Pursuant to Section 7(a)(2) of the ESA, all federal agencies must "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat of such species . . . determined . . . to be critical . . ."  16 U.S.C. § 1536(a)(2).   To fulfill this mandate, the acting agency must prepare a biological assessment for the purpose of identifying all endangered or threatened species which are likely to be affected by the action, 16 U.S.C. § 1536(c)(1), and must consult with FWS whenever such actions "may affect" a listed species.   16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). Because BLM's adoption and implementation of the management plans for the Arizona Strip are federal actions affecting the desert tortoise, California condor, and other listed species, BLM was required to consult with FWS on these plans.

38.   *Biological opinion.*  Consultation under Section 7(a)(2) results in the preparation of a biological opinion by FWS that determines if the proposed action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify a species' critical habitat.   The BiOp must include a summary of the information on which it is based and must adequately detail and assess how the action affects listed species and their critical habitats.  16 U.S.C. § 1536(b)(3).   Additionally, a biological opinion that concludes that the agency action is not likely to jeopardize a listed species or destroy or adversely modify its critical habitat must include an Incidental Take Statement which specifies the impact of any

incidental taking, provides reasonable and prudent measures necessary to minimize such impacts, and sets forth terms and conditions that must be followed.  16 U.S.C. § 1536(b)(4).  Where an agency action may affect a listed species, the absence of a valid biological opinion means that the action agency has not fulfilled its duty to insure through consultation that its actions will neither jeopardize a listed species nor destroy or adversely modify the species' critical habitat.

39.    The biological opinion must include an evaluation of the "cumulative effects on the listed species."  50 C.F.R. § 402.14(g)(3).  In addition to effects of other federal actions, "cumulative effects" include "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation."  50 C.F.R. § 402.02.

40.    Throughout its analysis, the biological opinion must utilize the "best scientific and commercial data available."   16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(d).  FWS must consider all the relevant factors and articulate a rational connection between the facts and its ultimate conclusion.

41.    If an action's impact on a species' habitat threatens *either* the recovery or the survival of a species, the biological opinion must conclude that the action adversely modifies critical habitat.  The ESA defines critical habitat as areas which are "essential to the conservation" of listed species. 16 U.S.C. § 1532(5)(A).  The ESA's definition of "conservation" includes the recovery of species.  *See* 16 U.S.C. § 1532(3).  Thus, the definition of "adverse modification" of critical habitat in 50 C.F.R § 402.14, limiting the term's meaning to degradation of critical habitat for *both* the survival and recovery of a listed species, is facially inconsistent with the statute and is

therefore invalid.

42.    *Prohibition against "take."*  ESA Section 9 and its implementing regulations prohibit any person from "taking" a threatened or endangered species.  16 U.S.C. § 1538(a)(1); 50 C.F.R. § 17.31.  A "person" includes private parties as well as local, state, and federal agencies.  16 U.S.C. § 1532(13).  "Take" is defined broadly under ESA to include harming, harassing, trapping, capturing, wounding, or killing a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns.  16 U.S.C. § 1532(19).  The ESA not only bans the acts of parties directly causing a take, but also bans the acts of third parties whose acts bring about the taking.

43.    One exception to Section 9's take prohibitions is relevant here.  A federal agency may take listed species only in accordance with an "Incidental Take Statement."  16 U.S.C. § 1536(b)(4).  If the terms and conditions of the Incidental Take Statement are followed, the federal agency and any permittee are exempted from Section 9's take prohibitions.  16 U.S.C. § 1536(o)(2).

44.    *Experimental Nonessential Populations*.  Section 10(j) of ESA provides a mechanism for the release of endangered species outside the current range of the species if the Secretary determines that such release will further the conservation of the species.  16 U.S.C. § 1539(j)(2).  Before release, the Secretary determines whether this experimental population is essential to the continued existence of the species or not.  Essential populations are treated as "threatened."  Nonessential populations are treated as species proposed to be listed, except when the nonessential population occurs in an area within the National Wildlife Refuge System or the National Park System.  *Id*.

# V.   FACTUAL BACKGROUND

## A.   Arizona Strip Field Office

45.   The Arizona Strip covers approximately 1.98 million acres of public land in isolated terrain adjacent to the Grand Canyon in the northwest corner of Arizona.  Of this total, approximately 1.68 million acres are not within either the Vermilion Cliffs or the Grand Canyon-Parashant National Monument and thus are covered by the management plan for the ASFO.

46.   As it is separated by the Grand Canyon from the rest of Arizona, the Arizona Strip is among the most remote and rugged public lands in the lower 48 states.  The area offers sweeping vistas, solitude amid scenic canyons, ponderosa pine forests and riparian habitat.  The Arizona Strip contains many documented and undocumented fossils and other geologic treasures.  Many special status species of both plants and animals inhabit the Arizona Strip, including the desert tortoise, desert-nesting bald eagle, peregrine falcon, and southwestern willow flycatcher.  Historic and cultural resources are also found on the Arizona Strip including remnants of Native American culture as well as that of the homesteaders.

47.   On December 12, 1996, six California condors were released to the wild from temporary holding pens at VCNM as part of FWS's Condor Reintroduction Program.   These and all subsequent Arizona-released California condors are classified as an experimental nonessential population under Section 10(j) of the ESA.  Pursuant to the special 10(j) rule for these California condors, take of any condor is generally prohibited throughout the experimental population area.  One exception to this take prohibition is when such take is unavoidable and unintentional and is non-negligent and incidental to a lawful activity.   *See* 61 Fed. Reg. 54044, 54057.

Reintroduction at VCNM has continued since 1996 and now over 60 condors fly freely throughout the Arizona Strip as well as adjacent and nearby lands, including the Grand Canyon National Park and lands in Utah and Nevada.  As a result, the Arizona-based condors' status under ESA changes depending on where the birds are at any given moment; because they are classified as a 10(j) population, when they are over NPS-administered lands (like parts of GCPNM) they are considered threatened under ESA while elsewhere they are considered species proposed for listing.

48.    Hunting is allowed in most of the Arizona Strip, including in VCNM and GCPNM.  BLM cooperatively manages hunting within the Arizona Strip with the Arizona Department of Fish and Game (AZDFG).  AZDFG issues hunting licenses for hunting within designated hunting units on BLM land.  No restrictions are imposed on the use of lead ammunition by either BLM or AZDFG.

49.    Since condors have been released in Arizona their leading cause of death has been lead poisoning, with at least 12 to 14 condors dying of lead poisoning in Arizona.  Evidence is overwhelming and there is scientific consensus that hunter-shot lead ammunition is the primary, if not the sole, source of lead that is poisoning California condors, who often feed on carcasses and gut-piles of hunter-shot game.  Alternative non-lead ammunition is readily available in almost all calibers used by hunters, including the recent development of non-lead .22 rimfire ammunition, previously thought to be technically infeasible.

50.    On November 16, 2005, BLM released a draft Resource Management Plan/Environmental Impact Statement ("Draft Plan/EIS") for the Arizona Strip, encompassing ASFO, GCPNM and VCNM.  The Center submitted comments on the Draft Plan/EIS on March 16, 2006.  BLM then

released a Proposed Resource Management Plan/FEIS ("Proposed Plan/FEIS") specifically addressing the ASFO on March 2, 2007 (the Monuments were addressed in separate documents, described below). The Center timely submitted a protest on April 2, 2007. BLM then issued a Record of Decision, adopting the Proposed Plan/FEIS on January 29, 2008.

51.   On November 7, 2007, FWS issued a Biological Opinion for the Arizona Strip Resource Management Plan (22410-2002-F-0277-R1, 22410-2007-F-0463) ("BiOp"), in response to a request by BLM dated May 6, 2007. The BiOp provided formal consultation under Section 7 of the ESA for the following species: Mexican spotted owl, southwestern willow flycatcher and its critical habitat, Yuma clapper rail, desert tortoise and its critical habitat, Virgin River chub and its critical habitat, woundfin and its critical habitat, Brady pincushion cactus, Holmgren milk vetch and its critical habitat, Jones' Cycladenia, Siler pincushion cactus, and Welsh's milkweed. The BiOp also provided formal consultation for California condors occurring on the NPS-administered land of the GCPNM within the nonessential experimental population area and ASDO land outside of the nonessential experimental population area. The BiOp provided informal consultation for the California condor on BLM lands within the nonessential experimental population area.

**B.   Grand Canyon-Parashant National Monument**

52.   Grand Canyon-Parashant National Monument was established on January 11, 2000, by President Clinton under the Antiquities Act of 1906, which authorizes the President to designate National Monument status to areas possessing significant historical, scenic, and/or scientific values. The GCPNM Proclamation highlights the significant resources that merit the area's National Monument status and call for its protection. Proclamation

No. 7265, 65 Fed. Reg. 2825 (Jan. 18, 2000) (hereinafter "GCPNM Proclamation").  These resources include the landscapes, numerous sensitive species, and many archaeological, geological, historic, cultural, and scenic attributes.

53.    GCPNM is collaboratively managed by BLM and the National Park Service ("NPS").  NPS has primary management authority over the portion of GCPNM that lies within the Lake Mead National Recreation Area, and BLM has primary management authority over the remaining part of the monument.

54.    GCPNM is rich in biological resources, including its giant Mojave yucca cacti and diverse wildlife such as the mule deer, Kaibab squirrels, wild turkey, and numerous threatened or endangered species, including the Mexican spotted owl, the California condor, the desert tortoise, and the southwestern willow flycatcher. Candidate or sensitive species are also present within the monument, including the spotted bat, the western mastiff bat, the Townsend's big eared bat, and the goshawk, and federally recognized rare plant species: Penstemon distans and Rosa stellata.  The ponderosa pine in the Mt. Trumbull area creates an ecosystem also recognized as a "biological resource of scientific interest." GCPNM Proclamation.

55.    The GCPNM is also considered a "geological treasure" as "[f]ossils are abundant in the monument." *Id*. Many invertebrate fossils can be found in GCPNM, specifically at the Grand Wash Cliffs, at Whitmore Canyon and throughout the Kaibab formation of Parashant Canyon.

56.    GCPNM contains striking scenic and visual resources. The monument is an area replete with remote, open, and undeveloped spaces on the edge of the Grand Canyon. The deep canyons, sedimentary rock layers,

mountains, and lonely buttes illustrate the geological history of the Colorado Plateau.

57.     The cultural resources of GCPNM include a rich human history which spans over 10,000 years.  The monument contains native rock art images, dwellings, quarries, agricultural features, villages, watchtowers, agricultural features, burial sites, caves, rockshelters, trails, and camps. The monument also contains areas of importance to modern-day native Americans.  There are also a plethora of more recent historical resources at GCPNM including ranch structures, corrals, fences, water tanks, the ruins of sawmills, and mines, illustrating the lifestyles of early homesteaders. According to the GCPNM Proclamation, "[t]he remote and undeveloped nature of the monument protects these historical sites in nearly their original context." *Id.* (emphasis added).

58.     On November 16, 2005, BLM released a Draft Plan/EIS for the GCPNM (combined with the Draft Plan/EIS for VCNM and the Draft Plan/EIS for Arizona Strip).  The Center submitted comments on the Draft Plan/EIS on March 16, 2006.  BLM then released a joint Proposed Plan/FEIS with the NPS on March 2, 2007.  The Center submitted a timely protest on April 2, 2007.  However, BLM adopted the Proposed Plan/FEIS with no significant changes, issuing a ROD on January 2, 2008.

59.     On November 7, 2007, FWS issued the BiOp described in paragraph 51, above, providing formal consultation for the threatened and endangered species occurring with the GCPNM.

## C.     Vermilion Cliffs National Monument

60.     VCNM was established on November 9, 2000, by President Clinton under the Antiquities Act of 1906.  Proclamation No. 7374, 65 Fed. Reg. 69,227 (Nov. 15, 2000) (hereinafter "VCNM Proclamation").  Besides

conferring National Monument status on the area, the VCNM Proclamation also identified its significant resources meriting its status and call for protection of these resources.   These resources include landscapes, numerous sensitive species, and many archaeological, geological, historic, cultural, and scenic attributes.

61.    VCNM supports a rich variety of plant and animal species.  A variety of wildlife species inhabit the Monument, including at least twenty species of raptors, desert bighorn sheep, pronghorn antelope, mountain lion, and other animals.  The Monument is also a designated location for the reintroduction for California condors "in an effort to establish another wild population of this highly endangered species." *Id*.  There are currently over 60 condors throughout the Arizona Strip that were released at VCNM.  The monument's vegetation consists of both cold desert flora and warm desert grassland, including the threatened Welsh's milkweed which can colonize and stabilize shifting sand dunes.

62.    VCNM hosts many scenic and geological features, including sandstone slickrock, brilliant cliffs, and rolling sandy plateaus.   Scenic features include the Paria Plateau, the Vermilion Cliffs, the Paria River Canyon, and associated landscape features such as amphitheaters, arches, and massive sandstone walls.  It contains some of the earliest rock art in the Southwest and high densities of Ancestral Puebloan sites.

63.    VCNM is managed by BLM.  On November 16, 2005, BLM released a draft Resource Management Plan/Environmental Impact Statement for the Monument, which was combined with the Draft Plan/EIS for GCPNM and the Draft Plan/EIS for the Arizona Strip.  The Center submitted timely comments on March 16, 2006.  BLM issued a Proposed Resource Management Plan/Final Environmental Impact Statement

(separate from the GCPNM and Arizona Strip) on March 2, 2007. The Center submitted a timely protest to the Proposed Plan on April 2, 2007. BLM issued a Record of Decision adopting the Proposed Plan with little or no changes on January 29, 2008.

64.   On November 7, 2007, FWS issued the BiOp described in paragraph 51, above, providing formal consultation for the threatened and endangered species occurring with the GCPNM.

## VI.   GENERAL ALLEGATIONS

### A.   NEPA Violations

65.   The provisions of the Proposed Plans/FEIS regarding ORVs in the ASFO, GCPNM, and VCNM violate NEPA and the APA in a number of ways, including the following: First, BLM failed to collect sufficient baseline data on Monument objects and other sensitive resources to determine the Proposed Plans' effects.  As one example, as much as 95 percent of the cultural resources present in the Strip are not yet recorded, making it impossible for the agency to have done a meaningful analysis of the effects of the Plan on these resources.  Second, BLM inadequately defined mitigation measures and improperly relied on monitoring as a form of mitigation for the effects of ORVs in BLM's decisions regarding which roads to designate as open for ORV use.  Third, the Route Evaluation Tree used to determine ORV routes does not include necessary considerations required by the law or give their relative weights, leading to possibly unacceptable management alternatives. Fourth, BLM's Proposed Plan did not appropriately consider or respond to the expert comments BLM received.  Fifth, the BLM based the Proposed Plan's motorized vehicles decisions on insufficient information, thus compromising the scientific

integrity of the Proposed Plan.  Finally, the scientific basis for BLM's road plan is not sound because it ignores generally accepted and abundant scientific work pointing to the direct, indirect, and cumulative impacts of roads on habitat and mortality rates of threatened, endangered, and rare species.

66.    The provisions of the Proposed Plans/FEIS regarding grazing on GCPNM and VCNM violate NEPA by failing to adequately address the impacts of livestock grazing on monument objects, riparian areas, forest habitats, wildlife, plant, and natural resources and ignoring specific evidence demonstrating such impacts.

67.    The Proposed Plans/FEIS discuss an insufficient range of alternatives in violation of NEPA, as alternatives were considered that would undermine and impair the conservation and protection of Monument resources in violation of the Monument Proclamations and the Antiquities Act, which require that any alternative considered in the Proposed Plans/FEIS prioritize conserving Monument Resources over all other management goals.

## B.    FLPMA Violations

68.    The provisions of the Proposed Plans/FEIS regarding ORVs in ASFO, GCPNM, and VCNM, violate FLPMA, the APA, and Executive Order 11989 in a number of ways, including the following:  First, the Route Evaluation Tree used to determine ORV routes does not include necessary considerations required by the law or give their relative weights, leading to possibly unacceptable management alternatives.  Second, BLM's Proposed Plan did not appropriately consider or respond to the expert comments BLM received.    Third, BLM based its motorized vehicles decisions in the Proposed Plan on insufficient information, thus compromising the scientific

integrity of the Proposed Plan.  Fourth, the scientific basis for BLM's road plan is further not sound because it ignores generally accepted and abundant scientific work pointing to the direct, indirect, and cumulative impacts of roads on habitat and mortality rates of threatened, endangered, and rare species.  Lastly, FLPMA dictates that BLM must manage its land in accordance with its own policies and BLM's Instruction Memorandum 2007-030 instructs that travel management decisions prioritize protection of cultural resources.

69.    The provisions of the Proposed Plans/FEIS regarding grazing in GCPNM and VCNM violate FLPMA's multiple use mandate by allowing and encouraging livestock grazing to the detriment of the natural resources that are required to be prioritized by the Monument Proclamations.

**C.    Violations of Presidential Proclamations**

70.    The Proposed Plans/FEIS and RODs for GCPNM and VCNM violate the Monument Proclamations by not prioritizing protection of the values for which GCPNM and VCNM were established and not analyzing a sufficient range of alternatives that reflect this priority.  Furthermore, the Plans permit the widespread use of ORVs within the Monuments, misidentify tracks, trails, and primitive roads as "roads," allow the use of mechanized vehicles off roads, utilize a flawed Route Evaluation Tree that does not adequately prioritize protection of the Monument, and ignore foreseeable impacts of designating ORV routes, all in violation of the Proclamations and their priorities.

**D.    ESA Violations**

71.    The BiOp fails to adequately analyze the Proposed Plans' impact on any of the listed species' recovery, or how the Plans will affect the value of designated critical habitat for recovery of the species.

Second Amended Complaint for Declaratory and Injunctive Relief          Page 26

72.     The BiOp fails to adequately evaluate the baseline conditions of any of the listed species or their habitat, the specific impacts caused by the activities approved by the Plans, or the cumulative impacts.

73.     The BiOp fails to consider the "best available scientific and commercial data available" in relation to the listed species occurring within the Arizona Strip, as required by § 7(a)(2) of the ESA.

74.     The BiOp improperly relies on unknown, unproven, and ineffective "reasonable and prudent measures" as mitigation for the Proposed Plans' effects on threatened and endangered species.  For example, the BiOp adopts mitigation measures to be determined at a later date if and when mining is permitted.  The BiOp admits that signage for road closures will only take place when funding becomes available, admitting that such funding is not guaranteed or required prior to the activities being mitigated.

75.     The BiOp approves the Proposed Plans' provisions regarding ORVs even though the BLM had not completed its Route Transportation Plan before the end of consultation, improperly relying on an "adaptive management" strategy to defer analysis of and mitigation for the Route Transportation Plan's impact on the desert tortoise and other listed species.

76.     The BiOp incorrectly concludes that the management plans are "largely in accordance" with the 1994 Desert Tortoise Recovery Plan and thus will not jeopardize the desert tortoise or destroy or adversely modify its critical habitat.  This conclusion is not supported within the BiOp and is contradicted by evidence before the FWS and BLM prior to issuance of the BiOp indicating that the management plans are inconsistent with the Desert Tortoise Recovery Plan.

77.     The BiOp fails to adequately consider desert tortoise Recovery Units in concluding that the Plans will result in no jeopardy and no adverse

modification to critical habitat.   The goal of the 1994 Desert Tortoise Recovery Plan is to preserve viable populations of desert tortoises within each of the Recovery Units, defined by the Recovery Plan as "geographic unit[s] harboring an evolutionary distinct population of the desert tortoise."

78.   The BiOp fails to adequately analyze particular threats and impacts to the desert tortoise, such as the threat from the spread of upper respiratory tract disease and the cumulative threats from non-federal activities on the tortoise.

79.   The BiOp fails to adequately describe how the loss of approximately 1,800 acres of desert tortoise critical habitat will affect the tortoise's survival or recovery.

80.   The BiOp ignores many of the indirect impacts on desert tortoises associated with paved and unpaved roads.

81.   The BiOp ignores the most current scientific information on the impact of roads and grazing on listed species, especially desert tortoises. Both activities can increase the spread of non-native vegetation which crowd out native flora, causing indirect and direct harm.

82.   The BiOp requires that livestock be moved when they have consumed 45% of the available forage in desert tortoise habitat, yet fails to demonstrate that this requirement is supported by sufficient evidence, and ignores evidence that much lower thresholds are required for protection of desert tortoises.   The BiOp relies on seasonal livestock restrictions with similar lack of evidentiary support of adequate protection of desert tortoises.

## VII.   CLAIMS FOR RELIEF

83.   For each of the Claims in this Complaint, the Center incorporates by reference each and every allegation set forth in this

Complaint as if set out in full below.

## First Claim for Relief

### (Against BLM for Violations of FLPMA, its implementing Regulations, relevant Executive Orders, and the Monument Proclamations' requirements)

84.    BLM has failed to collect and maintain a current inventory of the environmental resources of the Arizona Strip, including the GCPNM and the VCNM, including in the GCPNM and the VCNM, in violation of Section 201 of FLPMA, 43 U.S.C. §1711(a).  By failing to provide current data and inventory on many species and other resources before approving the Proposed Plan/FEIS, BLM violated its duty under the statute and undermined the regulatory requirements that current inventory data and information will be used to inform the planning process and assist in formulating subsequent monitoring requirements.  43 CFR § 1610.4-3.

85.    The planning prescriptions in the Proposed Plan/FEIS and RODs and the ORV routes adopted by BLM do not comply with the executive orders, laws, and regulations governing designation of routes because, *inter alia*, the BLM failed to consider the factors required by FLPMA, the executive orders, regulations, and the Monument Proclamations such as minimizing impacts of route designations on public lands resources, avoiding and minimizing impacts to listed species and rare habitats, and prioritizing the protection of the Monuments.  As a result, BLM violated the statute, the regulations, the executive orders, and the Monument Proclamations and failed to take all actions "necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C § 1732(b).

86.    BLM's adoption of the Proposed Plan/FEIS and the RODs is final agency action subject to judicial review under the APA.  5 U.S.C.

§§701-706, 706(2).

87.    The provisions of the Proposed Plans/FEIS regarding grazing in GCPNM and VCNM violate FLPMA's multiple use mandate by allowing and encouraging livestock grazing to the detriment of the natural resources that are required to be prioritized by the Monument Proclamations.

88.    For each of the above reasons, and others, BLM's adoption of the Proposed Plan/FEIS and the RODs, is arbitrary, capricious, and not in accordance with law as required by FLPMA, its implementing regulations, relevant executive orders, the Monument Proclamations, and the APA, and subject to judicial review under the APA.  5 U.S.C. §§701-706, 706(2).

## Second Claim for Relief

## (Against BLM for Violations of NEPA and CEQ Regulations)

89.    BLM violated NEPA and its implementing regulations by issuing  RODs adopting the Proposed Plans and by approving the Final EIS for the Proposed Plans that failed to meet the requirements of NEPA.  42 U.S.C. § 4331 *et seq.*; 40 C.F.R. § 1500.1 *et seq.*  BLM's environmental review for the Proposed Plan/FEIS is arbitrary, capricious, and otherwise not in accordance with law and/or constitutes final agency action unlawfully withheld or unreasonably delayed, in violation of 5 U.S.C. § 706.

90.    An EIS must provide a detailed statement of: (1) the environmental impact of the  proposed action; (2) any adverse environmental effects that cannot be avoided should the proposed action be implemented; (3) alternatives to the proposed actions; (4) the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action should it be implemented.  42 U.S.C. § 4332(C).  An EIS

must "inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.  NEPA also requires federal agencies to analyze the direct, indirect, and cumulative impacts of the proposed action. 40 C.F.R. §§ 1508.7, 1508.8.  In addition to alternatives and impacts, NEPA requires agencies to consider mitigation measures to minimize the environmental impacts of the proposed action.  40 C.F.R. § 1502.14 (alternatives and mitigation measures); 40 C.F.R. § 1502.16 (environmental consequences and mitigation measures).

91.   The RODs and FEIS that BLM prepared for the Proposed Plans failed to comply with each of these requirements of NEPA.  The FEIS does not analyze a full range of alternatives, include a proper and accurate "no action" alternative, include alternatives that prioritize conserving Monument Resources over all other management goals, include a proper description of the environmental baseline or setting, or adequately analyze the impacts of the proposed action on the resources of the Arizona Strip, the GCPNM, or the VCNM.  The FEIS also fails to properly consider mitigation measures to reduce the impacts of the proposed action on the resources of the ASFO and National Monuments.   In addition, BLM failed to maintain a current inventory of resources and therefore the environmental review relied on outdated, inaccurate and inadequate information in analyzing the impacts of the proposed action.

92.   For each of the above reasons, and others, BLM's adoption of the RODs and FEIS for the Proposed Plan is arbitrary, capricious, and not in accordance with law as required by NEPA, its implementing regulations, and the APA, and is subject to judicial review under the APA.  5 U.S.C. §§701-706, 706(2).

**Third Claim for Relief**

**(Against BLM and FWS for Violating ESA by Failing to Insure Against Jeopardy and Destruction or Adverse Modification of Critical Habitat)**

93.     BLM and FWS are violating Section 7(a)(2) of the ESA and its implementing regulations as set forth at 50 C.F.R. § 402.16 by failing to ensure through consultation that BLM's approval and implementation of the Arizona Strip Resource Management Plan does not jeopardize the following listed species within the Arizona Strip: desert tortoise, Mexican spotted owl, southwestern willow flycatcher, Yuma clapper rail, Virgin River chub, woundfin, Brady pincushion cactus, Holmgren milk vetch, Jones' Cycladenia, Siler pincushion cactus, and Welsh's milkweed; or destroy or adversely modify the designated critical habitat for the desert tortoise, Virgin River chub, woundfin, southwestern willow flycatcher, and Holmgren milk vetch.  BLM is violating this provision by carrying out these actions notwithstanding the fact that the conclusions in the BiOp are unsubstantiated and unlawful.   FWS is violating this provision by authorizing BLM to take federal actions that will jeopardize the listed species and/or destroy or adversely modify the designated critical habitat.

94.     The deficiencies in the BiOp render the FWS's "no jeopardy" and "no adverse modification" conclusions and the BLM's reliance on those conclusions arbitrary and capricious and therefore unlawful under the ESA and the APA.   These violations are subject to judicial review under 16 U.S.C. § 1540(g).

**Fourth Claim for Relief**

**(Against Defendant FWS for Violating ESA by Issuing Unlawful Biological Opinion)**

95.     FWS's issuance of the BiOp was arbitrary, capricious, and

unlawful because the conclusions in the BiOp were not based on the best available science, as required by the ESA, 16 U.S.C. § 1536(a)(2).

96.    FWS's issuance of the BiOp was arbitrary, capricious, and inconsistent with the law because the BiOp failed to address the cumulative effects of the proposed actions on the desert tortoise and other listed species and their critical habitat as required by ESA and its implementing regulations. 50 C.F.R. § 402.14.  Among the deficiencies in the BiOp are its failure to consider cumulative effects of increasing ORV use, livestock grazing and traffic, among other activities; failure to adequately evaluate the Proposed Plans' impact on any of the listed species' recovery; and reliance on unknown, unproven, and ineffective "reasonable and prudent measures" as mitigation for the Proposed Plans' effects on threatened and endangered species.

97.    For each of the above reasons, and others, FWS' issuance of the BiOp is arbitrary, capricious, and not in accordance with law as required by the APA, and is subject to judicial review thereunder. 5 U.S.C. §§ 701 through 706.

### PRAYER FOR RELIEF

WHEREFORE, the Center respectfully requests that this Court:

(1)    Adjudge and declare that Defendants' implementation of the Resource Management Plans for the Arizona Strip Field Office, the Vermilion Cliffs National Monument, and the Grand Canyon-Parashant National Monument through the approval of the Record of Decisions for the Arizona Strip Field Office, the Vermilion Cliffs National Monument, and the Grand Canyon-Parashant National Monument Resource Management Plans violates the Federal Land Policy and Management Act, its

implementing regulations, relevant Executive Orders, and the Monument Proclamations;

(2)     Adjudge and declare that Defendants' implementation of the Resource Management Plans for the Arizona Strip Field Office, the Vermilion Cliffs National Monument, and the Grand Canyon-Parashant National Monument through the approval of the Record of Decisions for the Arizona Strip Field Office, the Vermilion Cliffs National Monument, and the Grand Canyon-Parashant National Monument Resource Management Plans violates the National Environmental Policy Act and its implementing regulations;

(3)     Adjudge and declare that Defendant FWS's Biological Opinion for the Arizona Strip Resource Management Plan is arbitrary, capricious and inconsistent with the law;

(4)     Adjudge and declare that Defendant FWS's Biological Opinion for the Arizona Strip Resource Management Plan violated Sections 7(a)(2) and 7(a)(4) of the ESA because the agency has illegally concluded that BLM's actions will not jeopardize the Mexican spotted owl, southwestern willow flycatcher, Yuma clapper rail, desert tortoise, Virgin River chub, woundfin, Brady pincushion cactus, Holmgren milk vetch, Jones' Cycladenia, Siler pincushion cactus, and Welsh's milkweed or destroy or adversely modify designated critical habitat for the southwestern willow flycatcher, desert tortoise, Virgin River chub, woundfin, and Holmgren milk vetch.

(5)     Adjudge and declare that Defendant BLM's implementation of the Arizona Strip Resource Management Plan violates Sections 7(a)(2) and 7(a)(4) of the ESA because the agency has failed to insure that its actions do not jeopardize the Mexican spotted owl, southwestern willow flycatcher,

Yuma clapper rail, desert tortoise, Virgin River chub, woundfin, Brady pincushion cactus, Holmgren milk vetch, Jones' Cycladenia, Siler pincushion cactus, and Welsh's milkweed or destroy or adversely modify designated critical habitat for the southwestern willow flycatcher, desert tortoise, Virgin River chub, woundfin, and Holmgren milk vetch.

(6)     Order Defendants to vacate and set aside the Records of Decision for the Arizona Strip Field Office, the Vermilion Cliffs National Monument, and the Grand Canyon-Parashant National Monument Resource Management Plans;

(7)     Order Defendant FWS to vacate and set aside the Biological Opinion for the Arizona Strip Resource Management Plan (22410-2002-F-0277-R1, 22410-2007-F-0463);

(8)     Enjoin Defendants from authorizing any motorized vehicle use on any tracks, trails, and/or primitive roads in GCPNM and VCNM, to not take any actions to maintain, repair, or improve any tracks, trails, and/or primitive roads in GCPNM and VCNM, and otherwise immediately close any tracks, trails, and/or primitive roads in GCPNM and VCNM.

(9)     Award the Center its fees, costs, expenses and disbursements, including reasonable attorneys' fees; and

(10)   Grant the Center such additional and further relief as the court deems just and proper.


DATED: June 4, 2010

 _/s/ Adam Keats_____

Adam Keats (CA Bar No. 191157)
John Buse (CA Bar No. 163156)
CENTER FOR BIOLOGICAL DIVERSITY

351 California Street, Suite 600
San Francisco, CA 94104
Telephone: (415) 436-9682 x 304
Facsimile: (415) 436-9683
akeats@biologicaldiversity.org
jbuse@biologicaldiversity.org

Attorneys for Plaintiff Center for Biological
Diversity

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on June 9, 2010, I electronically transmitted the document **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Luther Langdon Hajek
US Dept of Justice ENRD
PO Box 663
Washington, DC 20044-0663
luke.hajek@usdoj.gov

Seth M. Barsky
US DOJ, Env. & Nat. Res. Div.
601 D St NW
Washington, DC 20004
seth.barsky@usdoj.gov

Srinath Jay Govindan
US DOJ, Env. & Nat. Res. Div.
PO Box 7369
Washington, DC 20044-7369
Jay.Govindan@usdoj.gov

Sue A Klein
US Attorney's Office
40 N Central Ave, Ste 1200
Phoenix, AZ 85004-4408
sue.klein@usdoj.gov

Anna Margo Seidman
Safari Club International
501 2nd St NE
Washington, DC 20002
aseidman@safariclub.org

Carl Dawson Michel
Michel & Associates PC
180 E Ocean Blvd, Ste 200
Long Beach, CA 90802
michel@michelandassociates.com

David T Hardy
8987 E Tanque Verde
PMB 265
Tucson, AZ 85749
dthardy@mindspring.com

William Lee Smith
Michel & Associates PC
180 E Ocean Blvd, Ste 200
Long Beach, CA 90802
lsmith@michelandassociates.com

Douglas Scott Burdin
Safari Club International
501 2nd St NE
Washington, DC 20002
dburdin@safariclub.org

Brian Fredrick Russo
Law Office of Brian F. Russo
111 W Monroe St, Ste 1212
Phoenix, AZ 85003
bfrusso@att.net

<u>Dated:  June 9, 2010</u>       <u>/s/ *Adam Keats*</u>
                Adam Keats