**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Center for Biological Diversity, ) | No. 09-CV-8011-PCT-PGR |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| United States Bureau of Land ) | |
| Management, et al., ) | |
| ) | |
| Defendants. ) | |

Before the Court are motions for summary judgment filed by Plaintiff Center for Biological Diversity ("Plaintiff") and Defendant Bureau of Land Management ("BLM"). At issue are challenges to Resource Management Plans ("RMP") for the Arizona Strip District in northern Arizona, drafted by the Bureau of Land Management ("BLM") after consultation with the United States Fish and Wildlife Service ("FWS").[1] Plaintiffs allege that the RMPs, particularly in their management of off-road travel and livestock grazing, violate the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA").

Plaintiff filed its amended complaint on March 25, 2009. (Doc. 21.) BLM filed its answer on May 4. (Doc. 31.) Plaintiff filed a summary judgment motion on September 15, 2010. (Doc. 98.) BLM filed a cross-motion for summary judgment on November 24, 2010.

---

[1] A companion case, *Wilderness Society v. BLM*, 09-CV-8010-PCT-PGR, also challenges the RMPs, alleging that BLM, particularly in its designation of routes within the National Monuments, violated applicable statutes and regulations.

(Doc. 106.) Defendant-Intervenor National Rifle Association ("NRA") filed a motion for partial summary judgment on December 10, 2010.(Doc. 115.) The Court heard oral argument on September 28, 2011.

Based on a review of the record and pleadings, Plaintiff's motion for summary judgment is denied. BLM's cross-motion for summary judgment and NRA's motion for partial summary judgment are granted.[2]

## I.    BACKGROUND

### A.    Arizona Strip RMPs

The Arizona Strip encompasses approximately 2.7 million acres of public land in northern Arizona. This region includes the Vermilion Cliffs National Monument, the Grand Canyon-Parashant National Monument, and other public lands within the Arizona Strip Field Office area. The majority of the public land within these areas is managed by BLM.

BLM's land management authority is governed by the Federal Land Policy Management Act ("FLPMA"), which directs the agency to manage public lands for multiple uses and sustained yield.  The FLPMA declares that "public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

Pursuant to the FLPMA, BLM undertook a planning process for the purpose of making management decisions regarding the land under its jurisdiction in the Arizona Strip Region. BLM issued a Draft Resource Management Plan/Draft Environmental Impact

---

[2]    Because NRA's substantive arguments largely duplicate BLM's (*see* Doc. 115 at 9–15), the Court will not address them separately.

Statement ("DEIS") for public review and comment in November 2005. ASRMP 058946.[3] BLM then prepared a Proposed RMP/FEIS, which was issued in January 2007. After additional public comment, BLM issued separate Records of Decision and RMPs for each of the Monuments and for the Arizona Strip Field Office in February 2008. ASRMP 62315, 62585, 62910.

The RMPs provide overall direction for the management of the region. ASRMP 62325–27, 62596–97, 62920–22. The RMPs implement BLM's decisions regarding the designation of routes for off-highway vehicle ("OHV") travel within the Monuments. ASRMP 62327–28, 62597–99, 62922. They also make administrative designations and land use allocations for particular uses, including livestock grazing. ASRMP 62326–27, 62597, 62991.

**B.    Endangered Species Act Listing and Consultation**

The only species at issue in Plaintiff's ESA claims is the desert tortoise. On April 2, 1990, FWS listed the Mojave population of desert tortoise as threatened under the ESA. 55 Fed. Reg. 12,178. On February 8, 1994, FWS published a final designation of critical habitat for the Mojave population of the desert tortoise. 59 Fed. Reg. 5,820. FWS identified 12 areas, with a total of 6.4 million acres, as critical habitat. R004514. Two critical habitat units in Arizona contain 338,700 acres, *id.*, 288,800 acres of which are on BLM lands. ASRMP 056159.

In June 1994, FWS finalized a Recovery Plan for the Mojave population of the desert tortoise, describing a strategy for recovering and delisting the species. *See* R004600. The Recovery Plan divides the Mojave population range into six recovery units and recommends that land management agencies establish 14 desert wildlife management areas ("DWMAs")

---

[3]    Consistent with both parties' briefing, citations to BLM's Arizona Strip Management Plan Administrative Record are denoted ASRMP [page number] and citations to FWS's record are R [page number].

1   throughout the recovery units, with at least one DWMA in each unit.[4] R004633–36,

2   R004650–56. The Recovery Plan identifies activities that directly or indirectly threaten the

3   desert tortoise and its habitat, such as domestic livestock grazing and OHV recreational use.

4   *See* R004753–93. While acknowledging that "cattle grazing under certain circumstances can

5   be compatible with desert tortoise survival," the Recovery Plan recommends that grazing

6   be prohibited in the DWMAs because, at the time of the plan's adoption, "there are no data

7   showing that continued livestock grazing is compatible with recovery of the desert tortoise."

8   R004672. The Recovery Plan also recommends vehicular controls such as restricting OHV

9   use to designated roads and limiting all competitive and organized events. R004670. The

10   Recovery Plan notes that these "recommendations" are to "aid land managers in the

11   development of management plans," such as BLM's RMPs, as "DWMA-specific

12   management actions cannot yet be precisely defined." R004660.

13       BLM and FWS engaged in formal consultations for actions affecting the desert

14   tortoise and its critical habitat, including the effects of livestock grazing and roads. ASRMP

15   055596–97, 056247. On November 7, 2007, after reviewing the proposed RMPs, the FWS

16   issued a BiOp to BLM regarding the effects of its proposed RMPs on listed species,

17   including the desert tortoise and its critical habitat. *See* ASRMP 056112. As discussed in

18   more detail below, FWS's BiOp concluded that BLM's implementation of the proposed

19   RMPs was not likely to jeopardize the desert tortoise or to destroy or adversely modify its

20   critical habitat. ASRMP 056212–13.

21

22

23       [4]     A "recovery unit" is a geographic area harboring an evolutionary distinct
24   population segment of the desert tortoise within the Mojave region. (R004645.) A "DWMA"
     is an administrative area in a recovery unit managed to afford reserve-level protection to
25   desert tortoise populations and habitat while maintaining and protecting other sensitive
     species and ecosystem functions. R004645. BLM established two DWMAs, Beaver Dam
26   Slope DWMA and Gold Butte-Pakoon DWMA, within the area covered by the Arizona Strip
27   RMPs. R004655.

28

1

## II.      STANDARD OF REVIEW

2       A motion for summary judgment must be granted when there is no genuine issue as

3   to any material fact and . . . the movant is entitled to judgment as a matter of law. Fed. R.

4   Civ. P. 56(c). Judicial review of final agency actions is governed by the Administrative

5   Procedure Act ("APA"), 5 U.S.C. § 701. *See Pyramid Lake Paiute Tribe of Indians v. U.S.*

6   *Dep't of the Navy*, 898 F.2d 1410, 1413 (9th Cir. 1990). The court shall set aside any agency

7   decision that it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in

8   accordance with law."  5 U.S.C. § 706(2)(A).

9       The court must determine whether the agency decision "was based on a consideration

10  of the relevant factors and whether there has been a clear error of judgment." *Citizens to*

11  *Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). An action is arbitrary and

12  capricious if "the agency has relied on factors which Congress has not intended it to consider,

13  entirely failed to consider an important aspect of the problem, offered an explanation for its

14  decision that runs counter to the evidence before the agency, or is so implausible that it could

15  not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle*

16  *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court may not

17  substitute its judgment for that of the agency or merely determine that it would have decided

18  an issue differently. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377 (1989).

19  Although the arbitrary and capricious standard "is narrow and presumes the agency action

20  is valid . . . it does not shield agency action from a 'thorough, probing, in-depth review.'"

21  *Northern Spotted Owl v. Hodel*, 716 F.Supp. 479, 481–82 (W.D.Wash. 1988) (quoting

22  *Overton Park*, 401 U.S. at 415).

23

## III.     DISCUSSION

24      Plaintiff alleges that BLM and FWS failed to comply with ESA and NEPA.

25  Specifically, Plaintiff challenges the agencies' analysis of the effects of the RMPs on the

26  populations of desert tortoises and California condors. With respect to the former, Plaintiff

27

28                                          – 5 –

alleges that the BiOp issued by FWS was arbitrary and capricious and violated the ESA by allowing excessive OHV use and livestock grazing. According to Plaintiff, these activities will adversely affect tortoise populations and habitat, and BLM violated NEPA by failing to consider and minimize such effects. With respect to condors, Plaintiff alleges that BLM violated NEPA by failing to consider and minimize the impact of the use of lead ammunition by hunters.

BLM counters that Plaintiff has failed to meet its burden of establishing that the BiOp is arbitrary and capricious. It contends that FWS considered the best scientific evidence and assessed all relevant factors in reaching its conclusion that the limited grazing and off-road use authorized by the RMPs is not likely to jeopardize the desert tortoise or harm its critical habitat.

With respect to the alleged NEPA violations, BLM argues that it properly analyzed the environmental impacts on and mitigation measures for California condors. BLM explains that it has no authority to regulate hunting on federal lands and its action in approving the RMPs had no effect on hunting in the Arizona Strip. Therefore, it was not required to evaluate the use of lead ammunition on condors. In addition, BLM claims the Court should not consider the issue because Plaintiff never raised the point in its comments during the NEPA process. Finally, BLM contends that its FEIS included a detailed discussion of measures it will take to mitigate the effects of its own actions on condors, including encouraging the use of non-lead ammunition. BLM also asserts that it adequately discussed the impact of its actions on desert tortoises, including the recommendations made by the FWS in its Desert Tortoise Recovery Plan.

### A.    Endangered Species Act

For any federal action that may affect a threatened or endangered species, the agency contemplating the action must undertake a "Section 7"consultation with the consulting agency to ensure that the federal action is not likely to jeopardize "the continued existence

of" an endangered or threatened species and will not result in the "destruction or adverse modification" of the designated critical habitat of the listed species. 16 U.S.C. § 1536(a)(2); *see Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1063 (9th Cir. 2004). The consultation process concludes with the consulting agency issuing a BiOp. *See Ariz. Cattle Growers' Assoc. v. United States Fish and Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir. 2001). The BiOp must address both jeopardy and critical habitat by considering the current status of the species, the environmental baseline, the effects of the proposed action, and the cumulative effects of the proposed action. *Gifford Pinchot*, 378 F.3d at 1063. In formulating its BiOp, the agency "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.14(g)(8); *Pacific Coast Fed'n of Fishermen's Ass'n, Inc. v. National Marine Fisheries Service*, 265 F.3d 1028, 1034 (9th Cir. 2001).

At issue here is the BiOp in which FWS reviewed the effects of the RMPs on listed species and designated critical habitat. Plaintiff claims that FWS's jeopardy analysis and conclusions regarding critical habitat were not supported by the evidence concerning the effects of grazing and OHV use. Therefore, according to Plaintiff, the BiOp and BLM's reliance on it are arbitrary and capricious.

As noted above, review under the APA's arbitrary and capricious standard is narrow and courts cannot substitute their judgment for that of the agency. *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en banc). In *River Runners for Wilderness v. Martin*, 593 F.3d 1064 (9th Cir. 2010) (per curiam), the Ninth Circuit reiterated the appropriate standard of review:

> The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts. An agency's decision may be set aside only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The standard is deferential. The court may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action. In conducting an APA review, the court must determine

1
2
3

> whether the agency's decision is founded on a rational connection between the facts found and the choices made . . . and whether [the agency] has committed a clear error of judgment. The [agency's] action . . . need only be a reasonable, not the best or most reasonable, decision.

4

*Id.* at 1070 (internal cites omitted). "The requirement that agency action not be arbitrary and

5

capricious includes a requirement that the agency adequately explain its result." *Public*

6

*Citizen, Inc. v. Federal Aviation Admin.*, 988 F.2d 186, 197 (D.C. Cir. 1993)

7

FWS issued an opinion concluding that implementation of the RMPs may have some

8

adverse effects on listed species but was not likely to "jeopardize the continued existence"

9

of the desert tortoise or "destroy or adversely modify . . . [its] critical habitat." ASRMP

10

056212. FWS further explained that the proposed action promoted recovery of the desert

11

tortoise by amending the RMP to be largely in accord with the Recover Plan with respect to

12

the management of desert tortoises and their critical habitat. ASRMP 056213.

13

The Court concludes, for the reasons set forth below, that FWS's conclusions were

14

"based on a consideration of relevant factors" and the agency did not commit a "clear error

15

of judgment." *Gifford Pinchot*, 378 F.3d at 1065 (internal citations omitted).

16

**1.    Jeopardy analysis**

17

As explained by FWS in its 2007 BiOp, "Most critical habitat designated for desert

18

tortoise in Arizona is within the DWMAs/ACEC. These lands receive reserve-level

19

protection that varies little from that proposed in the recovery plan." ASRMP 55718. FWS

20

further noted that desert tortoises occur in "two primary habitat areas in the planning area,"

21

the Beaver Dam slope and Pakoon Basin. ASRMP 56158. With respect to the Beaver Dam

22

slope, FWS found that the desert tortoise population "nearly stable." ASRMP 56159, 55719.

23

Though a "meaningful assessment" was problematic, FWS indicated that the tortoise

24

population in Pakoon Basin was "low, but stable."[5] ASRMP 055723; *see* ASRMP 055728.

25

26
27

---

[5]    Elsewhere the record indicates that desert tortoises in the Beaver Dam and Virgin Slopes ACECs were "dying at an alarming rate." ASRMP 06730. However, studies

28

FWS analyzed BLM's proposed RMPs and found that some authorized activities, such as OHV use, could adversely affect the desert tortoise and its habitat. *See* ASRMP 055615–16. Specifically, FWS found that OHV use may lead to OHV/tortoise collisions. FWS noted, however, that "given the relatively low level of public use in these areas, the incidence of injury or mortality should be very low." ASRMP 056187; *see also* ASRMP 056173–74, 056183–88, 055710–23. FWS explained that:

> [M]ortality is very low or non-existent threat for populations away from highways. The effects of roads on wildlife vary with road surface, traffic speed and volume, and density of the species. . . .
>
> Desert tortoise habitat on the Arizona Strip is characterized by single-width dirt roads with maximum safe travel speeds of 35 mph. Public use of most of these routes involves fewer than 10 vehicles per day, with most use occurring during the inactive season. Desert tortoise densities are lower in Parashant and the Arizona Strip FO than anywhere else in the range of the species.

ASRMP 060982 (citations omitted); *see also* ASRMP 056173–74. FWS also observed that "[m]any of the roads in desert tortoise habitat on the Arizona Strip are in remote areas that receive a low volume of traffic, including the Pakoon Basin and the Beaver Dam Slope. These are dirt roads where reported traffic collisions are rare." ASRMP 056187–88.

In addition, FWS noted that the conservation measures in the RMPs would mitigate the adverse effects of OHV use. *See* ASRMP 055615–16. For example, the RMPs close more than 350 miles of existing roads. ASRMP 062439, 062749. They restrict OHV use within the DWMAs/ACECs to "designated roads," ASRMP 063004, 062704, 062748, and allow OHV users to stop or park only within 100 feet of the center-lines of routes, ASRMP 056187. The RMPs also prohibit competitive speed events within the DWMAs/ACECs, and restrict organized non-speed events to the tortoises' inactive period. *Id.*

---

determined that the deaths were not the result of grazing or OHV use but were likely caused by disease. *Id.* At oral argument the parties conceded that there were no "hard and fast data" on the baseline population of desert tortoises.

In *National Wildlife Fed'n v. National Marine Fisheries Service*, 524 F.3d 917, 930 (9th Cir. 2008), the Ninth Circuit explained that, "Agency action can only 'jeopardize' a species' existence if that agency causes some deterioration in the species' pre-action condition." Here, the RMPs do not cause a "new risk of harm," *id.*, but improve on the status quo by putting in place measures designed to protect desert tortoises and their habitat. The RMPs are permissible under section 7(a)(2) to the extent that they do not "deepen[]" jeopardy already present in the environmental baseline "by causing additional harm." *Id.*

FWS concluded that desert tortoise populations in the DWMAs were "near stable" and that "[t]he proposed action promotes the recovery of the desert tortoise." Therefore, there is a "'rational connection' between the facts found and the no-jeopardy conclusion." *South Yuba River Citizens League v. National Marine Fisheries Service*, 723 F.Supp.2d 1247, 1258 (E.D.Cal. 2010) (rejecting BiOp where FWS made no predicate finding about the stability of the species' population); *see Cabinet Resource Group v. U.S. Fish and Wildlife Service*, 465 F.Supp.2d 1067, 1082–83 (D.Mont. 2006) ("As seen through the lens of ESA § 7(a)(2), the amendments proposed do slightly more for recovery and survival than the status quo. Consequently, the FWS satisfied its legal obligation in concluding that the Amendments do not reduce the likelihood of the survival and recovery of the grizzly.")

## 2. Critical Habitat

The "destruction or adverse modification" inquiry assesses whether "sufficient critical habitat is lost so as to threaten a species' recovery even if there remains sufficient critical habitat for the species' survival." *See Gifford Pinchot*, 378 F.3d at 1070. FWS concluded that the RMPs were not likely to jeopardize desert tortoise habitat. Instead, it found that the RMPs maintained or improved on the present quality of critical habitat.

FWS analyzed the current status of the tortoise's critical habitat and the future effects of BLM's proposed actions. FWS noted that "[d]esignation of most [critical habitat units] as DWMAs/ACECs has aided in protection of these areas, particularly by limiting off-highway

vehicle use and other ground-disturbing activities, and reducing or eliminating wild burros and livestock grazing in many units." ASRMP 56140. FWS also identified and discussed activities that disturb the tortoise's critical habitat, including livestock grazing and OHV use. ASRMP 056167–68.

FWS next considered the likely future impact of BLM's proposed action on desert tortoise critical habitat. *See* ASRMP 056180–89. FWS analyzed potential adverse effects and determined that the RMPs provide for management of critical habitat in a manner that would promote recovery of the desert tortoise. ASRMP 56213. This conclusion is supported by a number of considerations.

The RMPs closed or restricted certain grazing allotments, making the Tassi allotment and portions of the Mosby-Nay and Pakoon Springs allotments unavailable for grazing. ASRMP 055615–16, 060518. Most significantly, the RMPs limited grazing to the desert tortoise's inactive season and set grazing utilization levels at 45% of current year's growth on all allotments containing desert tortoise habitat. ASRMP 055616. These steps reduced the likelihood of trampling and forage competition for winter plants. ASRMP 056184–85. The RMPs also enlarged the Beaver Dam Slope and Virgin Slope ACECs, and designated the Pakoon WHA. ASRMP 055615. Furthermore, the RMPs required that tortoise habitat be monitored to assess the effects of grazing.[6] *See* ASRMP 055741, 061000–01. Finally, the RMPs are required to comply with the Arizona Standards for Rangeland Health, which mandates the conservation of the tortoise through maintenance and restoration of its habitat. R015914–15.

---

[6]   BLM notes that one of its grazing restrictions, the implementation of winter grazing schedules on the Beaver Dam and Virgin Slope ACECs, has been in place since 1998. ASRMP 061000. Studies suggest that "vegetative communities were healthy prior to implementation of grazing restrictions and continue to remain at or near their potential." *Id.* However, "[d]espite these somewhat encouraging results, tortoise populations apparently continued to decline." *Id.* at 061000–01.

- 11 -

1  In sum, as FWS explained in its BiOp:

2  The proposed action promotes recovery of the desert tortoise in the
   northeastern Mohave recovery unit by amending the Arizona Strip RMP to be
3  largely in accordance with desert tortoise recovery plan in regards to
   management of desert tortoises and their critical habitat on the Beaver Dam
4  and Virgin Slopes, and in Pakoon Basin. Critical habitat will be managed
   largely in accordance with the desert tortoise recovery plan.
5
6  ASRMP 056213.

7  Plaintiff disagrees with FWS's findings and asserts that continued grazing will

8  adversely affect the desert tortoise's critical habitat, notwithstanding the limitations set forth

9  in the RMPs. Plaintiff does not, however, challenge the data relied on by FWS, and the

10 record indicates that FWS fully considered the impact of continued grazing, including the

11 restricted grazing authorized in the RMPs. *See, e.g.*, ASRMP 056159, 056183–86. Also, as

12 described above, FWS found that OHV use may cause adverse effects due to OHV/tortoise

13 collisions, but that the conservation measures in the RMPs would reduce the likelihood of

14 such incidents. ASRMP 056183–89.

15 Notwithstanding the specific, mandatory conservation measures set out in the RMPs,

16 ASRMP 056254–60, Plaintiff claims that the BiOp is arbitrary and capricious based on its

17 inconsistency with the FWS's 1994 Desert Tortoise Recovery Plan, particularly the Plan's

18 recommendation that livestock grazing and OHV use in DWMAs be prohibited as generally

19 incompatible with tortoise recovery. Citing the discrepancies between the Recovery Plan and

20 the BiOp, Plaintiff argues that the FWS's expertise is not entitled to deference. (Doc. 98 at

21 6–7.) BLM counters that the consultation provisions of the ESA are not affected by the

22 recovery planning provisions of ESA § 7 and that, for the reasons discussed above, BLM

23 insured that the RMPs' authorization of restricted OHV use and limited grazing was not

24 likely to jeopardize the tortoise or adversely modify critical habitat. *See* ASRMP 60729–30,

25 056187–88, 056213.

26 Addressing this issue, the court in *Center for Biological Diversity v. U.S. Bureau of*

27

28                                          - 12 -

*Land Management* (*"CBD"*), 746 F.Supp.2d 1055, 1103 (N.D.Cal. 2009), *vacated in part*, 2011 WL 337364 (N.D. Cal. 2011), rejected the plaintiff's argument that FWS's no jeopardy finding was flawed because the plans at issue did not fully implement the Desert Tortoise Recovery Plan. The court explained that while the Recovery Plan is relevant to assessing the impact of the proposed actions on desert tortoise recovery, the ESA does not require that a Recovery Plan be fully implemented. *Id.*

Plaintiff argues that BLM, "having chosen to ignore recommendations in the Desert Tortoise Recovery Plan, . . . must disclose and evaluate the RMPs' significant environmental effects on tortoise recovery" but "manifestly failed to do so." (Doc. 118 at 18.) BLM counters that it did not ignore the Recovery Plan, noting that FWS's conclusions with respect to critical habitat were premised in part on the finding that the RMPs promoted tortoise recovery and were "largely in accordance" with or met the intent of the Recovery Plan. *See* ASRMP 056213.

With respect to OHV use, the RMPs implement the Recovery Plan's recommendations by closing roads to limit access, prohibiting off-road vehicle activity, prohibiting all competitive events, and restricting organized events to the tortoise's inactive season. (*See* R04670.) While the RMPs do not prohibit grazing in the DWMAs, they do take positive steps to limit grazing and improve habitat in a manner consistent with the concerns described in the Recovery Plan.

The record clearly shows that FWS considered the adverse effects of the RMPs, including the consequences of grazing and OHV use on the desert tortoise and its habitat. *See* ASRMP 055740 (identifying actions that implement the recovery plan); *see also CBD*, 746 F.Supp.2d at 1060 (approving BiOps where FWS "considered all relevant factors" and its "analyses and conclusions are supported by the record"). While Plaintiff takes issue with FWS's analysis of these effects, it has not demonstrated that BLM and FWS failed to consider the best available scientific data or any other relevant factors. *See id.* at 1109–17;

1    *see also River Runners*, 593 F.3d at 1070; *Gifford Pinchot*, 378 F.3d at 1065.

2         FWS reasonably determined that the RMPs were largely consistent with the Recovery

3    Plan and, despite impacts from OHV use and grazing, appropriately safeguarded the recovery

4    value of the existing desert tortoise critical habitat. *See Butte Environmental Council v. U.S.*

5    *Army Corps of Engineers*, 620 F.3d 936, 948 (9th Cir. 2010) (finding of no adverse

6    modification or destruction of critical habitat was not arbitrary and capricious despite FWS's

7    acknowledgement that some critical habitat would be destroyed); *cf. CBD*, 746 F.Supp.2d

8    at 1106 (emphasizing that BLM's plans "*improved* conditions for the desert tortoise").

9         **3.    Summary**

10        Viewing the BiOp with the appropriate level of deference to FWS's expertise, *see*

11   *Lands Council v. McNair*, 537 F.3d at 993, the Court finds that FWS adequately assessed the

12   current status of the desert tortoise population and its critical habitat, analyzed the possible

13   future effects resulting from the RMPs, considered all relevant factors and the best available

14   scientific data, and provided a reasoned and rational explanation supporting its "no jeopardy"

15   and "no adverse modification" determinations.[7] BLM's reliance on the BiOp did not violate

16   the ESA.

17        **B.    National Environmental Protection Act**

18        NEPA requires federal agencies to consider the consequences of their actions on the

19   environment. NEPA's mandate is "essentially procedural. . . . It is to insure a fully informed

20   and well considered decision." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S.

21   519, 558 (1978). "NEPA itself does not mandate particular results, but simply prescribes the

22

23

24        [7]    Plaintiff asserts that FWS's conclusions are not entitled to deference because
     the agency took conflicting positions in the Desert Tortoise Recovery Plan and the BiOp.
25   (Doc. 118 at 25.) The Court disagrees. FWS's position on the effects grazing remained
     consistent. In its BiOp, FWS simply concluded BLM sufficiently  restricted grazing so that
26   the tortoise population would not be jeopardized and its habitat would not be adversely
     modified.
27

28                                          - 14 -

necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Its goals are to ensure the agency will have detailed information on significant environmental impacts when it makes its decisions and guarantee that this information will be available to a larger audience. *Id.* at 349.

Under NEPA, an Environmental Impact Statement ("EIS") is required for "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(c). "A properly prepared EIS ensures that federal agencies have sufficiently detailed information to decide whether to proceed with an action in light of potential environmental consequences." *Oregon Environmental Counsel v. Kunzman*, 817 F.2d 484, 492 (9th Cir. 1986).

When the adequacy of an EIS is challenged in court, the relevant inquiry is whether the EIS takes a "hard look" at all potentially significant environmental effects. A court may not substitute its judgment for that of the agency. "The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976) (citation omitted).

A challenge to an EIS evaluation of environmental effects is subject to deferential review, with due consideration given to the agency's expertise. *Salmon River Concerned Citizens v. Robertson*, 32 F.3d 1346 (9th Cir. 1994). A court should apply a "rule of reason" and determine only whether the EIS "contains a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Half Moon Bay Fishermans' Ass'n v. Carlucci*, 857 F.2d 505, 508 (9th Cir. 1988); *see Kunzman*, 817 F.2d at 492 ("reviewing court may not 'fly speck' and EIS and hold it insufficient on the basis of inconsequential, technical deficiencies").

Plaintiff claims that BLM violated NEPA by failing to address potential impacts to condors and desert tortoises, including the effects of hunting with lead ammunition on

condors.[8]  BLM responds that it was not required to analyze the effects of lead ammunition on condors because it does not manage hunting in the Arizona Strip; because in promulgating the RMPs it did not take any "major federal action" with regard to hunting; and because adoption of the RMPs is not causally related to the use of lead shot and its effect on condors. BLM further argues that Plaintiff has waived its right to raise the issue because during the NEPA process, when given the opportunity to comment, Plaintiff never suggested that BLM was required to include an analysis of the effects of hunting with lead ammunition.

### 1.    Condors

The Court agrees that Plaintiff has waived its claims concerning BLM's failure to assess the impact of lead ammunition on condors. "Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 764 (2004) (quoting *Vt. Yankee Power*, 435 U.S. at 553); *see Protect Lake Pleasant, LLC v. Connor*, No. CIV 07-454-PHX-RCB, 2010 WL 5638735, at *37 (D.Ariz. July 30, 2010) ("plaintiffs have waived their right to challenge the Final EA as to drifting emissions because they did not raise that issue during the administrative process").

As BLM notes, Plaintiff in its 90-page comment letter made only the following reference to the issue: "We urge the BLM to continue working with Arizona Game and Fish Department with public education efforts to promote the use of non-lead ammunition to reduce the risk of lead ingestion . . ." ASRMP 35397. In a protest letter following publication of the FEIS, Plaintiff recommended that BLM impose "a prohibition on the use of lead bullets in the proposed [Kaibob-Paunagunt] ACEC and adjacent National Monument."

---

[8]    Condors are poisoned by consuming lead ammunition present in carcasses shot by hunters. (*See* Doc. 98 at 19.)

1   ASRMP 036533. It did not argue that BLM was required to include the potential effects of

2   lead ammunition in its analysis of environmental impacts.

3        Plaintiff's statements, the first of which does not appear to challenge the respective

4   roles of BLM and the Arizona Game and Fish Department, were not sufficient to alert the

5   BLM to Plaintiff's argument that BLM was mandated under NEPA to analyze the effects of

6   its actions on the use of lead ammunition by hunters. *Pub. Citizen*, 541 U.S. at 764.

7        The Court has also considered, and rejected, Plaintiff's remaining substantive NEPA

8   arguments. First, Plaintiffs assert that the RMPs "allow the use of lead ammunition by

9   hunters" and are therefore inadequate because they fail to discuss the impact of lead

10  ammunition on condors. BLM correctly notes that under FLPMA, the management of

11  hunting on public lands is reserved to the states.[9] "[N]othing in this Act shall be construed

12  as authorizing the Secretary concerned to require Federal permits to hunt and fish on public

13  lands or on lands in the National Forest System and adjacent waters or as enlarging or

14  diminishing the responsibility and authority of the States for management of fish and resident

15  wildlife." 43 U.S.C. § 1732(b); *see* 43 C.F.R. § 24.4(d) ("While the several States therefore

16  possess primary authority and responsibility for management of fish and resident wildlife on

17  Bureau of Land Management lands, the Secretary, through the Bureau of Land Management,

18  has custody of the land itself and the habitat upon which fish and resident wildlife are

19  dependent."). BLM and the Arizona Game and Fish Commission entered into a

20  Memorandum of Understanding governing the management of wildlife. BLM is responsible

21  for managing the habitat of special status species, while the Arizona Game and Fish

22

23

24        [9]    The Secretary of the Interior may *prohibit* hunting on certain areas of public
25  land "for reasons of public safety, administration, or compliance with provisions of
    applicable law" but must consult with the relevant state agencies before putting any such
26  designations into effect. 43 U.S.C. § 1732(b); *see Defenders of Wildlife v. Andrus*, 627 F.2d
    1238, 1250 (D.C.Cir. 1980). BLM is not exercising its limited authority to ban hunting, and
27  Plaintiff has not argued that it should do so.

28                                    - 17 -

1   Commission is responsible for regulating hunting.

2        Plaintiff nonetheless argues that BLM has the authority to preempt State management

3   of wildlife, that adoption of the RMPs itself constituted a major federal action triggering

4   NEPA's requirement that all adverse environmental impacts be discussed, and that the RMPs

5   do not maintain the status quo with respect to hunting. The Court disagrees. While the RMPs

6   discuss hunting and other forms of recreation, they do not take any action causally related

7   to the use of lead ammunition by hunters, an issue that was left to the State of Arizona.[10]

8   Therefore, with respect to the issue of lead ammunition used by hunters, there has been no

9   federal action.

10        In *Defenders of Wildlife v. Andrus*, 627 F.2d 1238, 1244 (D.C.Cir. 1980), the circuit

11  court held that "federal 'approval' of another party's action does not make that action federal

12  unless the federal government undertakes some 'overt act' in furtherance of that other party's

13  project." The court therefore declined to impose the NEPA process on a federal decision not

14  to intervene in Alaska's wolf hunt program, because the federal agency did "nothing more

15  than fail to prevent the other party's action from occurring." *Id.*; *see State of Alaska v.*

16  *Andrus*, 591 F.2d 537, 540 (9th Cir. 1979) (explaining that "even if the Secretary had some

17  power under a delegation by Congress to stop the wolf-kill program . . . his inaction was not

18  the type of conduct that requires an environmental impact statement."); *see also Fund for*

19  *Animals v. Thomas*, 932 F.Supp. 368, 371 (D.D.C. 1996) (holding that Forest Service policy

20  of deferring to states on game-baiting was not a major federal action). Contrary to Plaintiff's

21  argument, therefore, these cases do not provide BLM with the authority to regulate hunting

22  under the FLPMA and § 1732(b).

23        Plaintiff relies on *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363 (6th Cir. 2010), for

24

25  _____

26        [10]    The RMPs do not, as Plaintiff claims, promote additional impacts on condors by providing increased access for visitors. Rather, the RMPs reduce the miles of roads open

27  to visitors. *See* ASRMP 060973.

28                                  - 18 -

its argument that the federal government "possesses the authority to manage hunting on federal land." (Doc. 118 at 5.) In *Meister*, the Sixth Circuit held that the Forest Service abused its discretion and violated NEPA by failing to consider the plaintiff's proposed ban on gun hunting and snowmobiling in portions of a national forest. 623 F.3d at 379. The Forest Service argued that it was not authorized to ban hunting. The court noted, however, that the FLPMA provides that the Forest Service "may designate areas of public land and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law." *Id.* at 378 (quoting 43 U.S.C. § 1732(b)). The court also noted that the Forest Service's own regulations provided that state fish and wildlife laws do not apply where they "would permit activities that conflict with land and resource management responsibilities of the Forest Service or . . . are inconsistent with direction in forest plans." *Id.* at 379.

   *Meister* is inapposite because BLM is not subject to the same regulations as the Forest Service, which permit federal regulation of hunting in certain circumstances. In addition, the Forest Service in *Meister* was not prohibited from considering a ban on gun hunting because gun hunting on the small areas of land at issue—so-called "Primitive and Semiprimitive Nonmotorized" areas of the forest—was inconsistent with the Service's characterization of those areas as isolated from "the sights and sounds of humans." *Id.* at 375. Therefore, because gun hunting was inconsistent with the forest plans, and thus the Forest Service was authorized to prohibit gun hunting under its own regulations and the applicable section of the FLPMA, the Forest Service abused its discretion by failing to consider the plaintiff's proposed ban.

   None of these considerations are present here. BLM was not authorized by any applicable regulation or policy to ban hunting with lead ammunition. Therefore, it did not violate NEPA by failing to discuss the environmental impact of its decision not to address

- 19 -

the impacts of hunting with lead ammunition on condors.

In addition, an agency may properly exclude from NEPA analysis a state action that was complementary to, but distinct from, the federal action. *See Enos v. Marsh*, 769 F.2d 1363, 1371–72 (9th Cir. 1985); *see also Sabine River Authority v. U.S. Dept. of Interior*, 951 F.2d 669, 679 (5th Cir. 1992); *Upper Snake River v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1980) (EIS need not discuss the environmental effects of continuing to use land in the manner which it is presently being used (citing *Burbank Anti-Noise Group v. Goldschmidt*, 623 F.2d 115, 116 (9th Cir. 1980)). BLM's decisions regarding recreational use are complementary to but distinct from the Arizona Game and Fish Commission's hunting regulations. The fact that BLM regulates recreational shooting, defined as "the discharge of any firearm for any lawful, recreational purpose other than the lawful taking of a game animal," ASRMP 062272, does not, as Plaintiff contends, imply an authority to regulate hunting.

Because BLM did not take any "major federal action" with regard to hunting in the Arizona Strip, and the State's regulation of this issue was distinct from any federal action, BLM was not required under NEPA to analyze the potential impacts of hunting using lead ammunition.

Similarly, BLM was not required to perform a "cumulative effects" analysis to address the impact of non-federal actions on the California condor. "Cumulative effects" are defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. If no "incremental" impacts exist, a cumulative effects analysis is unnecessary. Here, BLM reasonably determined that its own actions would not affect the condor population, so a cumulative analysis of the state's decisions was unnecessary. *See Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1140 (9th Cir. 2006).

Finally, the Court concludes that BLM satisfied NEPA by sufficiently discussing both the effects of its actions on condors and its mitigation measures. In addressing the "Environmental Impacts" of the RMPs, BLM analyzed the effects of its actions on condors, including decisions regarding recreation, watershed restoration, the effect of vegetation and fire management, wildlife transplants and the construction and maintenance of wildlife water developments, and mineral extraction. ASRMP 060958, 060988–90, 060993, 060995, 060997.

BLM also set out, in "Conservation Measures for California Condor," a list of measures designed to protect the condor. ASRMP 061635–38. These include detailed guidelines for all construction projects, all BLM/NPA-authorized projects, all actions involving the use of aircraft, and fire use and suppression. *Id.* In addition, while BLM does not regulate hunting, one of its conservation measures with respect to condors provides that the "[u]se of non-lead ammunition is strongly encouraged for activities involving the discharge of firearms." ASRMP 061637.

This examination of mitigation measures meets the requirements of NEPA that the agency discuss mitigation measures "in sufficient detail to ensure that environmental consequences have been fairly evaluated." *Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 476 (9th Cir. 2000); *see Kunzman*, 817 F.2d at 492 (holding that if an EIS contains a "reasonably thorough discussion of the significant aspects of the probable environmental consequences," a court may not hold it insufficient).

### 2.   Desert tortoises

Finally, the Court finds that BLM adequately addressed the environmental impacts of its decisions on desert tortoises. Plaintiff's key contention is that the provisions of the RMPs are inconsistent with the recommendations in the Desert Tortoise Recovery Plan, and this inconsistency demonstrates that BLM violated NEPA by failing to take a "hard look" at impacts on the desert tortoise. Plaintiff further argues that BLM was required under NEPA

to discuss the inconsistencies between the RMP and the Recovery Plan.

As already noted, BLM was not required under NEPA to fully implement the recommendations of the Recover Plan. NEPA is a procedural statute and does not require substantive results. *See Marsh*, 490 U.S. at 371 (holding that NEPA "does not work by mandating that agencies achieve particular substantive [] results."); *Robertson*, 490 U.S. at 349 (holding that "NEPA itself does not mandate particular results, but simply prescribes the necessary process."). The records shows that BLM considered the Recovery Plan and FWS's concerns regarding grazing and OHV use, and FWS indicated that the RMPs were generally in accord with the plan. ASRMP 56213.

BLM discussed the environmental impact of its decisions on the desert tortoise, including the effects of livestock grazing. *See* ASRMP 060978–61018. For example, BLM acknowledged that "grazing by livestock (cattle and sheep) may have direct and indirect effects on tortoise populations including mortality from crushing of animals or their burrows, destruction of vegetation, alteration of soil, augmentation of forage . . . and competition for food." ASRMP 060998. BLM also discussed the efficacy of various mitigation measures, such as allowing livestock grazing only during years of abundant plant growth, closing areas to grazing, managing allotments as forage reserves, and placing allotments on winter-only grazing schedules. *See* ASRMP 056254–60 (itemizing steps to "[m]inimize or eliminate effects to desert tortoises from authorized projects"). In addition to these measures, BLM will monitor grazing to gather information on the effect of different grazing regimes on desert tortoise recovery. ASRMP 061409. These steps are sufficient to satisfy NEPA. *See Western Watersheds Project v. Bureau of Land Management*, No. 3:11–cv–00053–HDM–VPC, 2011 WL 1630789 (D.Nev. April 28, 2011) (explaining that "NEPA specifically allows agencies to utilize adaptive management plans that . . . monitor the real environmental effects of a project and allow the BLM to adapt its mitigation measures in response to the trends observed.").

### 3.      Summary

BLM fulfilled its responsibilities under NEPA by including "a reasonably thorough discussion of the significant aspects of the probable environmental consequences of a challenged action" that "fostered informed decisionmaking and public participation." *National Parks & Conservation Ass'n v. U.S. Dep't of Transportation*, 222 F.3d 677, 680 (9th Cir. 2000) (quotations and citations omitted). BLM took the requisite "hard look" at the environmental consequences of the RMPs on condors and desert tortoises.

## IV.   CONCLUSION

The standard of review under the APA is deferential. This Court "may not substitute its judgment for that of the agency concerning the wisdom or prudence of [the agency's] action." *Kunzman*, 817 F.2d at 492; *see River Runners*, 593 F.3d at 1070 ("The APA does not allow the court to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts.").

Under this deferential standard of review, the Court concludes that BLM and FWS complied with the ESA and NEPA.

Accordingly,

**IT IS HEREBY ORDERED denying** Plaintiff's motion for summary judgment (Doc. 98).

**IT IS FURTHER ORDERED granting** Defendant BLM's cross-motion for summary judgment (Doc. 106).

**IT IS FURTHER ORDERED granting** Intervenor-Defendant NRA's partial motion for summary judgment (Doc. 115).

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment accordingly.

DATED this 30th day of September, 2011.

Paul G. Rosenblatt
United States District Judge